IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-12

 No. 475A19

 Filed 12 March 2021

 IN THE MATTER OF: Q.P.W.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 16

 September 2019 by Judge Tonia A. Cutchin in District Court, Guilford County. Heard

 in the Supreme Court on 13 January 2021.

 Mercedes O. Chut for petitioner-appellee Guilford County Department of Health
 and Human Services.

 Christopher S. Edwards, for appellee Guardian ad Litem.

 Wendy C. Sotolongo, Parent Defender, by Annick I. Lenoir-Peek, Deputy Parent
 Defender, for respondent-appellant mother.

 HUDSON, Justice.

¶1 Respondent-mother appeals from the trial court’s orders terminating her

 parental rights to Q.P.W. (Quentin).1 After careful review, we affirm.

 I. Factual and Procedural History

¶2 Respondent-mother was the victim of a crime that left her pregnant at the age

 of thirteen. Respondent-mother was later placed in the custody of Guilford County

 Department of Social Services (DSS) pursuant to a juvenile dependency petition.

 1 A pseudonym is used in this opinion to protect the juvenile’s identity and for ease of

 reading.
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 Quentin was born to respondent-mother on 8 March 2014. Shortly after he was born,

 respondent-mother left Quentin in the hospital for two days without informing

 hospital staff that she was leaving.

¶3 On 20 May 2014, Quentin was adjudicated to be a dependent juvenile after the

 trial court found that respondent-mother was too young to provide proper care for

 herself and Quentin, that respondent-mother had left Quentin in the hospital, and

 that respondent-mother was in DSS custody herself. Respondent-mother and

 Quentin were placed in the same foster home and remained in a joint placement, with

 only brief interruptions, from May 2014 to November 2017.

¶4 Respondent-mother entered into a case plan with DSS on 5 June 2014.

 Pursuant to her case plan at that time, respondent-mother was required to attend

 school, complete parenting education and training, attend Quentin’s medical

 appointments, abide by the rules of her placement to avoid disruption, and participate

 in individual therapy. Quentin’s primary permanent plan at that time was

 reunification. Initially, respondent-mother engaged in her case plan by attending

 school, participating in therapy, participating in parent education programs, and

 attending medical appointments with her son.

¶5 However, respondent-mother also disobeyed the rules of her placements and

 ran away from her placements causing several disruptions to her joint placement

 with Quentin from 2014 to 2016. Eventually, respondent-mother refused to
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 participate in additional parenting classes, stopped attending school, stopped

 participating in therapy, and continued to disrupt her placement.

¶6 On 2 June 2017, the trial court entered an order warning respondent-mother

 that her failure to comply with her case plan could result in a change to Quentin’s

 primary permanent plan. By then, Quentin had been in over twelve placements.

¶7 Respondent-mother turned eighteen in November 2017 and was no longer

 eligible to continue placement with DSS because she was neither working nor

 attending school. As a result, her joint placement with Quentin was disrupted. From

 November 2017 through August 2018, respondent-mother had some contact with

 Quentin. On 10 August 2018, respondent-mother had her last visit with Quentin, and

 she failed to confirm a single subsequent visit as required by her case plan.

¶8 On 30 August 2018, DSS updated respondent-mother’s case plan and identified

 areas for improvement including obtaining employment, improving her parenting

 skills, and obtaining stable housing. In October 2018, DSS identified respondent-

 mother’s failure to address her mental health issues, her lack of stable housing, her

 failure to consistently visit with Quentin, her failure to comply with the

 recommendations from her parenting evaluation, and her failure to address her

 parenting deficits by completing parenting classes as barriers to achieving

 reunification.

¶9 On 16 November 2018, the trial court noted that respondent-mother had failed
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 to comply with requests for drug screenings, was not in appropriate housing, had

 failed to show up to work the previous week, had not attended any of Quentin’s

 medical appointments since the last court date, had failed to attend therapy since 1

 August 2018, and she had missed 21 visits with Quentin. The trial court found that

 respondent-mother was not actively participating in or cooperating with her case plan

 and found that she was not making adequate progress.

¶ 10 On 23 January 2019, the trial court terminated respondent-mother’s visits

 with Quentin and named several barriers to reunification including respondent-

 mother’s failure to participate in parenting classes, complete a psychological

 assessment and address her mental health needs, find safe and appropriate housing,

 and visit Quentin consistently. The primary plan for Quentin was changed to

 adoption. On 24 May 2019, the trial court found that respondent-mother was still not

 in compliance with the housing, parenting, and substance abuse portions of her case

 plan, and was not making adequate progress within a reasonable period of time.

¶ 11 In April 2019 DSS petitioned the trial court to terminate respondent-mother’s

 parental rights (TPR petition) alleging that termination was appropriate under

 N.C.G.S. § 7B-1111(a)(1), (2), (3), (6), and (7). A hearing on the TPR petition was held

 on 13 and 14 August 2019. On 16 September 2019 the trial court entered an order

 terminating respondent-mother’s parental rights pursuant to N.C.G.S. § 7B-

 1111(a)(1), (2), (3), (6), and (7) (TPR order). Respondent-mother filed a notice of
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 appeal on 18 September 2019.

 II. Standard of Review

¶ 12 We have previously explained the standard of review for termination of

 parental rights appeals as follows:

 Proceedings to terminate parental rights consist of an
 adjudicatory stage and a dispositional stage. At the
 adjudicatory stage, the petitioner bears the burden of
 proving by clear, cogent, and convincing evidence that one
 or more grounds for termination exist under section 7B-
 1111(a) of the North Carolina General Statutes. We review
 a trial court’s adjudication under N.C.G.S. § 7B-1109 to
 determine whether the findings are supported by clear,
 cogent and convincing evidence and the findings support
 the conclusions of law. The trial court’s conclusions of law
 are reviewable de novo on appeal.

 In re K.H., 375 N.C. 610, 612 (2020) (cleaned up).

 III. Analysis

¶ 13 In this case, the trial court determined that grounds existed to terminate

 respondent-mother’s parental rights based on neglect, willful failure to make

 reasonable progress, willful failure to pay a reasonable portion of her child’s cost of

 care, dependency, and willful abandonment. N.C.G.S. § 7B-1111(a)(1)–(3), (6)–(7)

 (2019). Respondent mother has not contested any findings of fact,2 and thus, they are

 binding on appeal. In re T.N.H., 372 N.C. 403, 407 (2019) (“Findings of fact not

 2 Respondent-mother discusses findings 19 and 26 in her brief, but her only argument

 is that these findings include irrelevant information. She makes no argument that these
 findings are not supported by clear, cogent, and convincing evidence. Furthermore, we do not
 rely on either of these findings in reaching our disposition.
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 challenged by respondent are deemed supported by competent evidence and are

 binding on appeal.”).

¶ 14 We begin our review of the TPR order to determine whether the trial court’s

 findings of fact support its conclusion that there were grounds to terminate

 respondent-mother’s parental rights pursuant to N.C.G.S. § 7B-1111(a)(2), which

 provides as follows:

 The parent has willfully left the juvenile in foster care or
 placement outside the home for more than 12 months
 without showing to the satisfaction of the court that
 reasonable progress under the circumstances has been
 made in correcting those conditions which led to the
 removal of the juvenile. No parental rights, however, shall
 be terminated for the sole reason that the parents are
 unable to care for the juvenile on account of their poverty.

 N.C.G.S. § 7B-1111(a)(2).

¶ 15 We have previously explained that:

 [t]ermination under this ground requires the trial court to
 perform a two-step analysis where it must determine by
 clear, cogent, and convincing evidence whether (1) a child
 has been willfully left by the parent in foster care or
 placement outside the home for over twelve months, and
 (2) the parent has not made reasonable progress under the
 circumstances to correct the conditions which led to the
 removal of the child.

 In re Z.A.M., 374 N.C. 88, 95–96 (2020).

¶ 16 First, we review whether the findings support the conclusion that Quentin had

 been willfully left in foster care or placement outside the home for more than twelve
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 months. “[T]he twelve-month period begins when a child is left in foster care or

 placement outside the home pursuant to a court order, and ends when the motion or

 petition for termination of parental rights is filed.” In re K.H., 375 N.C. at 613

 (quoting In re J.G.B., 177 N.C. App. 375, 383 (2006)). Here, DSS filed its TPR petition

 in April 2019. Therefore, the relevant twelve-month period is from April 2018 to April

 2019.

¶ 17 The trial court made the following relevant findings of fact:

 14. . . . [Respondent-mother] reached the age of majority on
 November 30, 2017. . . .

 ...

 c. . . . [Respondent-mother] left her placement . . .
 after reaching the age of majority. . . .

 ...

 25. . . .

 a. The juvenile has been placed in foster care
 continuously since March 19, 2014.

 These findings demonstrate that Quentin was in foster care and was not sharing a

 placement with his mother beginning in December 2017—more than twelve months

 before DSS filed the TPR petition.

¶ 18 Respondent-mother’s willfulness can be established by evidence that she

 possessed the ability to make reasonable progress but was unwilling to make an

 effort. In re Baker, 158 N.C. App. 491, 494 (2003). The following portions of finding of
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 fact 14 are relevant to respondent-mother’s willfulness:

 b. . . . [Respondent-mother] was asked to continue
 parenting education, to address her decision making.
 Parenting education was offered to [respondent-mother],
 but she chose not to attend any parenting classes.
 [Respondent-mother] was referred to PATE on March 31,
 2017[.] . . . To date, [respondent-mother] has only
 completed one PATE class and has not made any contact
 with the facilitator to reengage in the program.

 ...

 [Respondent-mother] refused to participate in a
 psychological evaluation and has indicated that she is tired
 of completing tasks for [DSS].

 ...

 . . . Since reaching the age of majority on November 30,
 2017, [respondent-mother] has not attended any medical
 appointments for the juvenile. . . . [Respondent-mother]
 has missed all her visits with the juvenile since August 10,
 2018, and has not contacted [DSS] to inquire about
 reinstating visitation.

 c. . . . [Respondent-mother] was advised that Section 8 had
 openings . . . by [DSS] and [respondent-mother] was urged
 to go apply for the opening immediately. Despite being
 given this resource, [respondent-mother] moved out of her
 grandmother’s home and is currently renting a room [in
 Greensboro]. . . . To-date [sic], [respondent-mother] has
 failed to demonstrate any stability with regard to her living
 situation, and she is not in compliance with this component
 of her case plan.

 d. . . . To date, [respondent-mother] has not completed a
 substance abuse assessment.

¶ 19 We determine that these findings support a conclusion of willfulness.
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 Therefore, the findings of fact in the TPR order support the conclusion that

 respondent-mother willfully left Quentin in foster care or placement outside the home

 for over twelve months prior to April 2019.

¶ 20 Next, we review whether the trial court’s findings of fact support its conclusion

 that respondent-mother has not made reasonable progress to correct the conditions

 which led to the removal of Quentin. Regarding the conditions that led to the removal

 of the juvenile, the trial court made the following finding of fact:

 The conditions that led to the juvenile coming into custody
 include [respondent-mother’s] inability to provide basic
 needs for herself and the juvenile due to [respondent-
 mother’s] status as a minor child in the custody of [DSS];
 [respondent-mother’s] inability to provide the required
 medical care for the juvenile; lack of an appropriate adult
 caregiver for the juvenile; [respondent-mother] leaving the
 juvenile at the hospital for two days without anyone to
 make decisions for the juvenile and paternity had not been
 established.

 Respondent-mother argues that the conditions that led to Quentin’s removal were all

 attributable to her own minor status. She argues that the requirements of her case

 plan did not have a sufficient nexus to that condition. We disagree.

¶ 21 Our Court has previously explained that our appellate case law

 reflects a consistent judicial recognition that parental
 compliance with a judicially adopted case plan is relevant
 in determining whether grounds for termination exist
 pursuant to N.C.G.S. § 7B –1111(a)(2) even when there is
 no direct and immediate relationship between the
 conditions addressed in the case plan and the
 circumstances that led to the initial governmental
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 intervention into the family’s life, as long as the objectives
 sought to be achieved by the case plan provision in question
 address issues that contributed to causing the problematic
 circumstances that led to the juvenile’s removal from the
 parental home. The adoption of a contrary approach would
 amount to turning a blind eye to the practical reality that
 a child’s removal from the parental home is rarely the
 result of a single, specific incident and is, instead, typically
 caused by the confluence of multiple factors, some of which
 are immediately apparent and some of which only become
 apparent in light of further investigation.

 In re B.O.A., 372 N.C. 372, 384–85 (2019).

¶ 22 Here, DSS modified respondent-mother’s case plan and reviewed it several

 times to adjust for her changing circumstances as more information came to light

 about the barriers to reunification. The case plan requirements were tied to

 respondent-mother’s need to demonstrate maturity and stability. For example, in

 order to care for Quentin, respondent-mother needed to learn parenting skills,

 demonstrate a commitment to Quentin on a sustained basis, and find stable housing

 and employment. We conclude that the case plan requirements were properly tied to

 alleviating the conditions which directly or indirectly contributed to the problematic

 circumstances that led to Quentin’s removal—namely, respondent-mother’s

 immaturity and instability.

¶ 23 Regarding respondent-mother’s failure to make reasonable progress, the trial

 court made the following relevant findings of fact:

 13. [Respondent-mother] has had the opportunity to correct
 the conditions that led to the juvenile’s removal from the
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

home, including but not limited to being offered and
entering into, a service agreement with [DSS]. [DSS]
identified needs arising out of the conditions that led to the
removal of the juvenile and developed a service agreement
to assist [respondent-mother] in addressing those needs.

14. [Respondent-mother] . . . entered into the case plan on
June 5, 2014. On March 26, 2018, . . . [respondent-
mother’s] case plan was updated. . . .The service
agreement was reviewed on August 30, 2018, November
13, 2018, and February 11, 2019. . . .

 ....

 b. Parenting Skills/Mental Health—[Respondent-
 mother] has made minimal progress on the
 parenting component of her case plan. . . .
 [Respondent-mother] completed the parenting
 program at [her placement] in September 2014.
 Because [respondent-mother] continued to take the
 juvenile on unauthorized overnight stays with
 adults who were not authorized by [DSS],
 [respondent-mother] was asked to continue
 parenting education, to address her decision
 making. Parenting education was offered to
 [respondent-mother], but she chose not to attend any
 parenting classes. [Respondent-mother] was
 referred to PATE on March 31, 2017[.] . . . To date,
 [respondent-mother] has only completed one PATE
 class and has not made any contact with the
 facilitator to reengage in the program.

 [Respondent-mother] completed a parenting
 assessment with Dr. McColloch on June 15, 2017.
 Dr. McColloch recommended that [respondent-
 mother] participate in a psychological evaluation,
 trauma focused therapy, individual counseling, and
 parenting classes. . . . [Respondent-mother] last
 attended therapy on August 1, 2018. . . .
 [Respondent-mother] refused to participate in a
 psychological evaluation and has indicated that she
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

is tired of completing tasks for [DSS].

....

. . . Since reaching the age of majority on November
30, 2017, [respondent-mother] has not attended any
medical appointments for the juvenile. When
[respondent-mother] and the juvenile were no longer
placed together, . . . [respondent-mother] was . . .
allowed to have supervised visits with the juvenile
at the foster home with the permission of the
juvenile’s foster parent. On October 17, 2018, due to
[respondent-mother] missing twenty-one (21) visits
with the juvenile, visitation between [respondent-
mother] and the juvenile was reduced to one day per
week for one hour. [Respondent-mother]
subsequently failed to attend any of her scheduled
visits with the juvenile, and her visits were
suspended on January 9, 2019. [Respondent-
mother] has missed all her visits with the juvenile
since August 10, 2018, and has not contacted [DSS]
to inquire about reinstating visitation. [Respondent-
mother] is not in compliance with the parenting
component of her case plan.

c. Placement/Housing—At the commencement of the
underlying case, [respondent-mother’s] only
requirement under this component of her case plan
was to comply with the rules and policies of her
placement. . . . When [respondent-mother] has [sic]
aged out of foster care the placement component of
her case plan has [sic] changed to a requirement that
[respondent-mother] obtain and maintain stable
housing suitable for her and the juvenile.
[Respondent-mother] has not made any progress on
this component of her case plan. . . . On March 8,
2018, [respondent-mother] reported that she had her
own apartment, however, the lease she provided on
April 5, 2018 stated that the lease term ended on
April 1, 2018. On July 26, 2018, [respondent-mother]
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

again reported that she had her own two-bedroom
apartment paying $375.00 per month in rent.
[Respondent-mother] went on to state that she was
sharing the apartment with her sister but since her
sister moved out, the rent was taking up her entire
check. On August 10, 2018, [respondent-mother]
reported that she was living with her mother
because her apartment complex made her move out
due to safety concerns. [Respondent-mother]
explained that a domestic violence incident occurred
between her and her ex-boyfriend, and the ex-
boyfriend trashed her apartment. . . . On September
18, 2018, [respondent-mother] reported that she was
living with her grandmother. [Respondent-mother]
was advised that Section 8 had openings . . . by
[DSS] and [respondent-mother] was urged to go
apply for the opening immediately. Despite being
given this resource, [respondent-mother] moved out
of her grandmother’s home and is currently renting
a room [in Greensboro]. . . . To-date [sic],
[respondent-mother] has failed to demonstrate any
stability with regard to her living situation, and she
is not in compliance with this component of her case
plan. [Respondent-mother] entered into a Voluntary
Placement Agreement on August 9, 2018. . . .

When [respondent-mother] entered into the
Voluntary Placement Agreement she was residing
. . . in her own apartment, but she moved out due to
safety concerns with her ex-boyfriend. On August
30, 2018 [respondent-mother] reported that she was
living with a friend [in Greensboro]. On September
18, 2018 [respondent-mother] reported that she was
staying with her grandmother and great
grandmother. . . . She advised Social Worker Young
and Social Worker Stewart that she could not stay
with her friend anymore. [Respondent-mother] was
advised that all moves need to be reported in order
to get approval. On November 16, 2018 Social
Worker Stewart met with [respondent-mother] who
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

stated that things weren’t going well and that she
needed to be out of her grandmother’s home by the
end of the month. Ms. Stewart provided [respondent-
mother] with housing resources. [Respondent-
mother] moved [to another house]. She was renting
a room in this house with several others. She was
paying $250 per month for rent and was responsible
for the light bill. On January 11, 2019 SW Stewart
spoke with [respondent-mother] who stated that she
had to leave her previous placement and was now
living with her father because she has no place else
to go. She was advised that her VPA will be
terminated because she was living with her father
and that they would meet the next week to get VPA
termination papers signed. On January 22, 2019 SW
Stewart spoke with [respondent-mother] who stated
that she was now living with a friend [in
Greensboro]. As of March 18, 2019, [respondent-
mother] continue [sic] to reside at [that] address.
She stated that she had put in an application for
housing [elsewhere], however she still has an
outstanding balance of $1000.00 on her housing
record. [Respondent-mother] did advise [DSS] that
she is currently living at another address but failed
to provide the actual address.

d. Substance Abuse—[Respondent-mother] has not
made any progress in addressing her substance
abuse needs. . . . On October 10, 2018, Social Worker
Young referred [respondent-mother] for a substance
abuse assessment. . . . To date, [respondent-mother]
has not completed a substance abuse assessment.
On August 31, 2018, [respondent-mother] was asked
to comply with a drug screen by no later than
September 4, 2018. [Respondent-mother] did not
comply. [Respondent-mother] was also asked to
submit to a drug screen on September 18, 2018, and
she did not comply. On October 17, 2018,
[respondent-mother] was ordered by the court to
submit to a drug screen by the end of the day.
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

 [Respondent-mother] submitted to a drug screen on
 October 18, 2018 and tested positive for marijuana.
 On November 13, 2018, the assigned social worker
 requested that [respondent-mother] submit to a
 random drug screen, and [respondent-mother] did
 not comply. As of the filing of the petition,
 [respondent-mother] has only submitted to one drug
 screen which was positive for marijuana.
 [Respondent-mother] is not in compliance with the
 substance abuse component of her case plan.

 ....

 25. . . .

 ....

 b. The lack of reasonable progress under the
 circumstances is not due solely to the poverty of
 [respondent-mother] . . . but is the direct result of
 [her] failure to address the conditions that led to the
 removal of the juvenile, including [respondent-
 mother’s] failure to maintain stable housing, failure
 to attend parenting classes, failure to cooperate with
 drug screens, [and] failure to attend visits . . . .

 We conclude that these findings support the trial court’s conclusion that respondent-

 mother failed to make reasonable progress under the circumstances to correct the

 conditions which led to Quentin’s removal.3

 IV. Conclusion

¶ 24 We conclude that the trial court properly found that grounds existed to

 3 Respondent-mother argues that she has made reasonable progress, pointing to her

 participation in a DSS program for people transitioning out of foster care. However, her
 participation in that program alone is not sufficient to prevent or negate the conclusion that
 she has failed to make reasonable progress.
 IN RE Q.P.W.

 2021-NCSC-12

 Opinion of the Court

terminate respondent-mother’s parental rights under N.C.G.S. § 7B-1111(a)(2). The

trial court’s conclusion that one statutory ground for termination existed is sufficient

in and of itself to support termination of respondent-mother’s parental rights. In re

E.H.P., 372 N.C. 388, 395 (2019). Therefore, we need not address respondent-mother’s

arguments regarding N.C.G.S. § 7B-1111(a)(1), (3), (6), and (7). Furthermore,

respondent-mother does not challenge the trial court’s conclusion that termination of

her parental rights was in Quentin’s best interests. See N.C.G.S. § 7B-1110(a) (2019).

Accordingly, we affirm the trial court’s order terminating respondent-mother’s

parental rights.

 AFFIRMED.
 Justice EARLS dissenting.

¶ 25 The result of the majority’s decision today is that a nineteen-year-old mother

 who became pregnant when she was sexually assaulted as a thirteen-year-old girl

 will permanently and unnecessarily lose her right to maintain any relationship with

 her child. The trial court’s findings of fact do not support the conclusion that

 petitioner has met its burden of “proving by clear, cogent, and convincing evidence

 the existence of one or more grounds for termination under section 7B-1111(a) of the

 General Statutes.” In re K.D.C., 375 N.C. 784, 788 (2020) (cleaned up). This decision

 is not compelled by North Carolina law and illustrates this Court’s continued refusal

 to accord sufficient respect to a parent’s fundamental constitutional-liberty interest

 in raising their child. Accordingly, I respectfully dissent.

 V. Factual Background

¶ 26 The circumstances underlying the present case are highly distressing.

 Respondent’s own mother was convicted of aiding and abetting in the sexual assault

 perpetrated by a twenty-year-old man which led to respondent’s pregnancy. After the

 assault, respondent was first placed with her grandmother, who quickly realized that

 she was unable to provide respondent with adequate care. On 5 March 2014,

 respondent was adjudicated to be a dependent juvenile and placed into the custody of

 the Guilford County Department of Social Services (DSS). Three days later,

 respondent gave birth to her son, Quentin. Twelve days after Quentin was born, he

 was also adjudicated to be a dependent juvenile due to respondent’s “inability to care
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 for herself, much less an infant child.”

¶ 27 Initially, respondent and Quentin were placed together in a foster home.

 Respondent entered into a case plan on 5 June 2014. Although respondent

 occasionally exhibited disruptive or inappropriate behaviors while in foster care, she

 substantially complied with her case plan and made continuous progress towards

 reunification over the next four years, despite experiencing frequent instability as

 she was moved between numerous foster care placements. There is no evidence in the

 record that respondent ever abused Quentin, nor is there evidence that her behaviors

 ever exposed Quentin to a significant risk of harm. Respondent aged out of the foster

 care system when she turned eighteen on 30 November 2017. Less than two years

 later, the trial court terminated her parental rights to Quentin.

 VI. Willful Failure to Make Reasonable Progress Under the Circumstances:
 N.C.G.S. § 7B-1111(a)(2)

¶ 28 In affirming the trial court’s order terminating respondent’s parental rights on

 the grounds that she has willfully failed to make reasonable progress towards

 correcting the conditions that led to Quentin’s removal, the majority ignores the

 myriad constraints on respondent’s ability to comply with her case plan imposed by

 respondent’s circumstances. This unwillingness to examine the realities of

 respondent’s situation—particularly her age and her recent experience attempting to

 transition out of the foster care system—is inconsistent with the “ongoing

 examination of the circumstances” we have previously deemed appropriate in
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 assessing a respondent-parent’s reasonable progress under N.C.G.S. § 7B-1111(a)(2).

 In re B.O.A., 372 N.C. 372, 382 (2019). Accordingly, I disagree with the majority’s

 approach and would instead hold that the trial court was required to consider

 respondent’s holistic circumstances in assessing both the willfulness of her conduct

 and the reasonableness of the progress she made towards correcting the conditions

 that led to Quentin’s removal.

¶ 29 Pursuant to N.C.G.S. § 7B-1111(a)(2), a court may terminate a respondent-

 parent’s parental rights when the parent has “willfully left the juvenile in foster care

 or placement outside the home for more than 12 months without showing to the

 satisfaction of the court that reasonable progress under the circumstances has been

 made in correcting those conditions which led to the removal of the juvenile.” N.C.G.S.

 § 7B-1111(a)(2) (2019). We have previously explained that “[w]illfulness is

 established when the respondent had the ability to show reasonable progress, but

 was unwilling to make the effort.” In re S.M., 375 N.C. 673, 685 (2020) (quoting In re

 McMillon, 143 N.C. App. 402, 410, disc. review denied, 354 N.C. 218 (2001)); see also

 In re Matherly, 149 N.C. App. 452, 455 (2002) (“Evidence showing a parents’ ability,

 or capacity to acquire the ability, to overcome factors which resulted in their children

 being placed in foster care must be apparent for willfulness to attach.”). A trial court

 cannot fulfill its obligation to assess willfulness when it blinds itself to important

 context. The trial court must consider that context even if some of the relevant events
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 occurred before the respondent-parent reached the age of majority. In this case,

 respondent’s experiences both within and immediately upon leaving the foster care

 system are relevant in assessing the willfulness of the conduct which forms the basis

 of DSS’s termination petition. See In re Pierce, 356 N.C. 68, 75 n.1 (2002) (“[T]here is

 no specified time frame that limits the admission of relevant evidence pertaining to

 a parent’s ‘reasonable progress’ or lack thereof.”).

¶ 30 For four years after giving birth to Quentin at the age of fourteen, respondent

 continued making progress towards reunification with her son to the repeated

 satisfaction of the trial court. She continued making progress even while she was

 moved across multiple placements and while dealing with all of the ordinary

 challenges of adolescence, compounded by the fact that she was a minor parent who

 was herself in DSS custody. Throughout this difficult period, respondent remained

 committed to learning to parent Quentin. She undeniably developed a meaningful

 bond with her child. Her persistence in the face of tremendous adversity suggests

 that her conduct which forms the basis of the underlying termination petition—

 conduct which occurred during a short period of time immediately after the

 respondent reached the age of majority and while she was attempting to make the

 difficult transition from foster care to independent living—reflected difficulties

 inherent in her unique circumstances which would be resolved in time, rather than a

 willful failure to make reasonable progress within the meaning of N.C.G.S. § 7B-
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 1111(a)(2).1 Cf. Lecky v. Reed, 20 Va. App. 306, 312 (1995) (holding that termination

 of minor parent’s parental rights was warranted because “[n]othing in this record

 attributes mother’s parental deficiencies to her age or suggests that the mere passage

 of time would resolve her difficulties”).

¶ 31 The trial court’s and the majority’s steadfast refusal to fully consider

 respondent’s circumstances is also inconsistent with the realities of adolescent

 development. Although our legal system often draws a sharp distinction between

 “minors” and “adults,” this binary does not account for the fact that “psychological,

 social, and economic forces have shifted the way that people experience their late

 teens and early twenties.” Clare Ryan, The Law of Emerging Adults, 97 Wash. U. L.

 Rev. 1131, 1147 (2020). Scientific research has demonstrated that “the years from the

 late teens to the early twenties constitute a transitional period that bridges

 adolescence and mature adulthood” where “[d]evelopment is gradual, and the

 psychological boundaries between adolescence and adulthood are fuzzy.” Elizabeth S.

 Scott et al., Young Adulthood As a Transitional Legal Category: Science, Social

 Change, and Justice Policy, 85 Fordham L. Rev. 641, 645 (2016). The Court of Appeals

 has held that if a respondent-parent has not yet turned eighteen when DSS files its

 1 It is notable that in regard to respondent’s final foster care placement before reaching

 the age of majority, the trial court found that respondent “did very well in her placement with
 [the foster parent] as [the foster parent] provided strong support and guidance for respondent
 to learn parenting skills.” Respondent only left this placement when she aged out of the foster
 care system upon turning eighteen.
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 termination petition, the trial court is required to “make specific findings of fact

 showing that a minor parent’s age-related limitations as to willfulness have been

 adequately considered.” In re Matherly, 149 N.C. App. at 455. I agree with the Court

 of Appeals and would hold trial courts to the same requirement when the respondent-

 parent is a young adult, especially when, as here, many of the pertinent events

 occurred prior to the parent reaching the age of majority.2

¶ 32 We need not and should not adopt the fictitious presumption that everything

 respondent did after she turned eighteen was willful. Instead, we should examine her

 circumstances and capacities holistically, acknowledging “[r]ecent research in

 neuroscience and developmental psychology [which] indicates that individuals

 between the ages of 18 and 21 share many of the[ ] same characteristics” as minors.

 Pike v. Gross, 936 F.3d 372, 385 (6th Cir. 2019) (Stranch, J., concurring), cert. denied,

 207 L. Ed. 2d 171 (U.S. 2020). This research has particular implications for children

 in foster care who must immediately attempt to live independently at age eighteen.

 “It is now well established among social scientists that young adults who emancipate

 from foster care, when compared to their peers, are far more likely to suffer from

 2 Regardless, the trial court made numerous factual findings regarding incidents
 which occurred prior to respondent reaching the age of majority, including factual findings
 regarding her purported disruption of foster care placements. The trial court relied on these
 factual findings in arriving at its ultimate conclusion that respondent had willfully failed to
 make reasonable progress to correct the conditions that led to Quentin’s removal. However,
 a legitimate question arises in this case of whether respondent’s conduct relating to
 correcting those conditions was willful during the period that she was in foster care. The
 trial court’s factual findings do not address that question.
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

homelessness, unemployment, unplanned pregnancy, lack of health care, and

incarceration, among other problems.” Bruce A. Boyer, Foster Care Reentry Laws:

Mending the Safety Net for Emerging Adults in the Transition to Independence, 88

Temp. L. Rev. 837, 837 (2016). As Boyer explains:

 Both social scientists and neurologists now recognize that
 true “adult” functioning, measured in terms of cognitive,
 behavioral, and social maturity, is not achieved for the
 majority of emerging adults until well into the third decade
 of life. During this transitional phase, while most young
 people begin the process of separating from their families,
 few do so precipitously or without setbacks. Studies
 generally place the median age at which adolescents first
 leave home in the early twenties, and many of those
 adolescents who leave home for the first time between the
 ages of eighteen and twenty-four return to live in their
 parental households at some time thereafter, even if only
 for a short time. One recent study found that
 approximately 55% of young men and 46% of young women
 between eighteen and twenty-four years old were living at
 home with one or both of their parents. Other studies have
 concluded that the average age at which children in the
 general population finally depart the home is twenty-eight.
 The staging of the transition to independence is
 particularly indispensable for youth from less well-off
 families seeking to balance work, school, and the
 achievement of the credentials needed to sustain
 independence.

Id. at 840–41 (footnotes omitted). The failure to examine respondent’s progress in

light of this context is a legal error because it reflects a failure to properly apply the

statutory mandate to consider respondent’s reasonable progress “under the

circumstances.” N.C.G.S. § 7B-1111(a)(2).
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

¶ 33 Therefore, in this case, the trial court’s findings do not support the conclusion

 that respondent “had the ability to show reasonable progress, but was unwilling to

 make the effort.” In re S.M., 375 N.C. at 685 (quoting In re McMillon, 143 N.C. App.

 at 410). The evidence instead only indicates that respondent failed to make more

 progress than she did due to her limited capacities as a very young parent who was

 attempting to live independently for the first time, without the benefit of adequate

 financial resources or a support network. Although the state maintains a substantial

 interest in the welfare of all children in North Carolina, including those born to minor

 parents, consideration of a young parent’s circumstances is consistent with the

 Juvenile Code’s goals of protecting juveniles “by means that respect both the right to

 family autonomy and the juveniles’ needs” while “preventing the unnecessary or

 inappropriate separation of juveniles from their parents.” N.C.G.S. § 7B-100(3)–(4)

 (2019).

¶ 34 Additionally, the majority misses the mark in summarily disregarding

 respondent’s “participation in a DSS program for people transitioning out of foster

 care.” Although respondent acknowledges that she did not fully comply with her case

 plan after reaching the age of majority, she argues that her engagement with the NC

 LINKS program—which provides services to young adults exiting the foster care

 system to help them attain education, employment, health, and housing stability—is

 relevant in assessing whether she made reasonable progress towards correcting the
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 conditions which led to Quentin’s removal. In this case, as the majority notes, the

 requirements of respondent’s case plan “were tied to [her] need to demonstrate

 maturity and stability.” Certainly, respondent’s participation in a program designed

 to assist young adults in achieving positive life outcomes is a possible indicator of her

 increased maturity. Because participation in the NC LINKS program is entirely

 optional, respondent’s choice to seek out additional support could reflect an

 awareness of her own limitations and a recognition that she needed help in order to

 adequately care for herself and her son. Further, if respondent’s participation in the

 NC LINKS program helped her advance her education, obtain employment and

 housing, and improve her mental and physical health, then she would have made

 substantial progress towards addressing the material conditions which rendered her

 unable to parent Quentin.

¶ 35 We have never held that a respondent-parent’s compliance, or lack thereof,

 with a DSS case plan is dispositive in determining whether the requirements of

 N.C.G.S. § 7B-1111(a)(2) have been met. This statutory ground does not permit

 termination of parental rights merely on the basis that a respondent-parent has

 failed to comply with his or her case plan. In re E.C., 375 N.C. 581, 585 (2020) (“A

 trial court should refrain from finding that a parent has failed to make reasonable

 progress in correcting the conditions that led to the children’s removal ‘simply

 because of his or her failure to fully satisfy all elements of the case plan goals.’ ”
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

(quoting In re B.O.A., 372 N.C. at 385)). Rather, it permits termination only when a

parent has failed to make “reasonable progress under the circumstances” towards

“correcting those conditions which led to the removal of the juvenile.” N.C.G.S. § 7B-

1111(a)(2). A parent’s compliance with a case plan is often evidence that he or she

has made reasonable progress under the circumstances because case plans are

typically developed to address the specific conditions which led to a child’s removal.

See In re J.S., 374 N.C. 811, 815–16 (2020) (“[I]n order for a respondent’s

noncompliance with her case plan to support the termination of her parental rights,

there must be a nexus between the components of the court-approved case plan with

which the respondent failed to comply and the conditions which led to the child’s

removal from the parental home.” (cleaned up)). However, it is possible for a parent

to make reasonable progress towards addressing the substantive conditions which

led to a child’s removal from the parental home in a manner other than the one

specified in a DSS-approved case plan. See, e.g., In re K.D.C., 375 N.C. at 792 (holding

that petitioner had failed to prove grounds existed under N.C.G.S. § 7B-1111(a)(2)

where “respondent-mother failed to complete a parenting class as required by her

case plan, . . . [but] completed a ‘Mothering’ class, which appears to be at least a

plausible attempt by respondent-mother to complete her case plan and to improve

her parenting skills”). Accordingly, the trial court erred in failing to consider

respondent’s participation in the NC LINKS program as probative evidence of her
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 progress towards addressing the conditions that led to Quentin’s removal. If

 respondent was able to address the substantive barriers preventing her from caring

 for Quentin through her participation in the NC LINKS program, then N.C.G.S. § 7B-

 1111(a)(2) does not supply a ground for terminating her parental rights.

¶ 36 Finally, the trial court erred in failing to assess whether respondent’s inability

 to meet the requirements of her case plan stemmed from her poverty, rather than her

 willful conduct. See In re M.A., 374 N.C. 865, 881 (2020) (“[P]arental rights are not

 subject to termination in the event that [a parent’s] inability to care for her children

 rested solely upon poverty-related considerations . . . .”). The trial court’s bare

 assertion that “[t]he lack of reasonable progress under the circumstances is not due

 solely to the poverty of [respondent], but is the direct result of [her] failure to address

 the conditions that led to the removal of the juvenile,” is puzzling given the evidence

 that respondent’s lack of financial resources caused her to be unable to meet the

 conditions of her case plan. For example, the trial court notes that respondent “had

 put in an application for housing” but that “she still ha[d] an outstanding balance of

 $1000.00 on her housing record.” The record discloses that respondent made

 numerous efforts to obtain housing after reaching the age of majority. Thus, there is

 evidence in the record indicating that respondent’s poverty, rather than a lack of

 effort, directly caused her continued inability to maintain stable housing. The trial

 court’s conclusory finding that respondent’s lack of progress was not due to poverty
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 is insufficient to support the legal conclusion that respondent had the actual ability

 to comply with the conditions imposed by her case plan. Cf. In re McMillon, 143 N.C.

 App. at 412 (affirming order terminating parental rights despite respondent’s claim

 that he was impoverished because “[t]he components of the DSS plan did not require

 material resources”); In re A.W., 237 N.C. App. 209, 217 (2014) (affirming order

 terminating parental rights when “there was a sufficient basis in the record for

 terminating the Father’s parental rights that had nothing to do with poverty”).

 VII. Other Grounds

¶ 37 Having wrongfully affirmed the portion of the trial court’s order concluding

 that respondent willfully failed to make reasonable progress within the meaning of

 N.C.G.S. § 7B-1111(a)(2), the majority does not address any of the other grounds for

 terminating respondent’s parental rights adjudicated by the trial court. With regard

 to these other grounds, I would also hold that the trial court’s conclusions are not

 supported by clear, cogent, and convincing evidence.

¶ 38 First, there is insufficient evidence in the record to support the conclusion that

 grounds exist to terminate respondent’s parental rights on the basis of neglect. The

 trial court’s sole conclusion of law supporting termination pursuant to N.C.G.S. § 7B-

 1111(a)(1) is that respondent was presently neglecting Quentin based on her failure

 to comply with her case plan. However, respondent’s failure to comply with her case

 plan cannot establish ongoing neglect in this case because respondent has not had
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 custody of her son for many years. Because there is insufficient evidence that Quentin

 was a neglected child within the meaning of N.C.G.S. § 7B-101(15), petitioner must

 prove that respondent previously neglected Quentin and that she is likely to do so

 again in the future. In re R.L.D., 375 N.C. 838, 841 n.3 (2020). The only evidence of

 prior neglect that petitioner can point to is respondent’s conduct in the immediate

 aftermath of giving birth to Quentin as a fourteen-year-old, when she left Quentin in

 the hospital for two days. There is no evidence that Quentin was in any way harmed

 by respondent’s brief absence. Accordingly, I would hold that the record does not

 support the conclusion that respondent’s parental rights may be terminated under

 N.C.G.S. § 7B-1111(a)(1).

¶ 39 Second, the evidence presented at trial does not support the conclusion that

 respondent willfully failed to pay a reasonable portion of the cost of caring for Quentin

 pursuant to N.C.G.S. § 7B-1111(a)(3). The evidence indicates that respondent made

 three child support payments during the six months preceding the filing of the

 termination petition. The evidence also indicates that the total amount paid by

 respondent was less than the total amount she owed during this period. This Court

 has not addressed whether the ground provided for in N.C.G.S. § 7B-1111(a)(3) is

 automatically triggered whenever a parent fails to pay the full amount of a valid child

 support obligation. Regardless, the evidence establishes that respondent did not fail

 to pay a reasonable portion of the cost of care “for a continuous period of six months
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 immediately preceding the filling of the petition” because she paid the full amount of

 child support owed for a monthly period on at least one occasion during these six

 months. N.C.G.S. § 7B-1111(a)(3) (emphasis added). Accordingly, I would hold that

 N.C.G.S. § 7B-1111(a)(3) does not support the termination of respondent’s parental

 rights.

¶ 40 Third, the record evidence plainly does not support the conclusion that

 respondent is incapable of caring for Quentin within the meaning of N.C.G.S. § 7B-

 1111(a)(6). According to the trial court, this ground for termination has been met

 because respondent once tested positive for marijuana. However, as Quentin’s

 guardian ad litem rightly conceded in its brief, evidence that a parent uses drugs is

 insufficient to prove that the parent is incapable of caring for his or her child absent

 a finding that the parent’s drug use will “prevent the parent from providing [the child

 with] proper care and supervision.” In re D.T.N.A., 250 N.C. App. 582, 585 (2016).

 The record is bereft of any evidence suggesting that respondent’s purported substance

 abuse problem caused her to be “incapable of providing for the proper care and

 supervision of” Quentin. N.C.G.S. § 7B-1111(a)(6). Thus, the trial court erred in

 concluding that the requirements of N.C.G.S. § 7B-1111(a)(6) had been met.

¶ 41 Finally, the record does not support the conclusion that respondent willfully

 abandoned Quentin within the meaning of N.C.G.S. § 7B-1111(a)(7). In order to

 establish willful abandonment, there must be evidence establishing that respondent
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

 evinced a “purposeful, deliberative and manifest willful determination to forego all

 parental duties and relinquish all parental claims to [the child].” In re A.G.D., 374

 N.C. 317, 319 (2020) (alteration in original) (quoting In re N.D.A., 373 N.C. 71, 79

 (2019)). Here, respondent made multiple child support payments in the six months

 immediately preceding the filing of the termination petition. In addition, she enrolled

 in the NC LINKS program, purportedly in an effort to address the deficiencies which

 prevented her from providing for Quentin as his parent. These actions are

 inconsistent with the conclusion that respondent “deliberately eschewed . . . her

 parental responsibilities in their entirety.” In re E.B., 375 N.C. 310, 318 (2020).

 Accordingly, I would hold that petitioner has not met its burden of proving that

 respondent willfully abandoned Quentin pursuant to N.C.G.S. § 7B-1111(a)(7).

 VIII. Conclusion

¶ 42 Simply put, neither the termination statutes nor our precedents endorse the

 blinkered approach the majority adopts in reviewing the trial court’s order

 terminating respondent’s parental rights. The majority’s analysis entirely ignores the

 likelihood that respondent’s behavior in the year subsequent to reaching the age of

 majority was substantially influenced by the conditions she lived in during the

 preceding years when she was in DSS custody. To the extent that respondent may

 have lacked the resources or capacity to parent Quentin immediately upon turning

 eighteen, then DSS itself bears a substantial share of the responsibility as her
 IN RE Q.P.W.

 2021-NCSC-12

 Earls, J., dissenting

caregiver. The outcome of the majority’s decision unfairly punishes a young mother

who has exhibited remarkable fortitude in striving to raise her child under difficult

circumstances. Accordingly, I would vacate the trial court’s order terminating

respondent’s parental rights and remand for further factfinding which considers all

of the relevant evidence, including her circumstances, financial resources, and

participation in the NC LINKS program, in determining whether she willfully failed

to make reasonable progress in correcting the conditions which led to Quentin’s

removal.